## FARR *v.* SWAN.

1. An allotment on Schuylkill Front street, on Holmes's map, to a first purchaser, with proof of an allotment of a square, according to the present plan, to twenty-five persons, of whom this first purchaser was one, with title from him and possession had for forty years, is evidence of a possession sufficiently ancient to support the title without proof of actual location by warrant and survey.
2. But such ancient possession merely is not sufficient to raise a presumption of a grant in favour of the same party in his own right, for more than his own quantity, as a first purchaser, against the Commonwealth or its grantee, for, per SERGEANT, J., this would require another presumption, namely, of a conveyance from some other first purchaser, which cannot be made from a mere possession encroaching on the proprietary or Commonwealth.
3. The act of 1781 was directed against intruders without colour of right, not against persons in possession, or entering within seven years thereafter, and holding under first purchasers.
4. Warrant and survey not necessary to title of a first purchaser to an appurtenant city lot.
5. An extract from a paper in the land-office, if it appear to contain all that relates to the subject in controversy, (as an entire square,) is evidence.
6. Nor is it necessary it should show by whom or when made, for the presumption is in favour of regularity.
7. An objection that a paper "is not original" is a waiver of any defect in the acknowledgment, when the paper is a certified copy of a deed from the recorder's office.
8. A surveyor permitted to state where he would locate a warrant similar to that under which defendant held.

ERROR to the District Court of the city and county of Philadelphia.

*Feb.* 27, *March* 2, 3, 4.—This was an ejectment for two lots in the square at the corner of Vine and Schuylkill Front street, included in plan C, between double lines. On the trial, before Pettit, president judge, the plaintiff claimed under a deed from the Penitentiary Commissioners, in 1830, under the act of 1821, March 20th. Then, as proof the lots were vacant, he showed a warrant and survey to Emlen, in right of Kellenbeck, in 1768, 1770, for the lot between the lots in question, extending from Second to Front streets, describing it as bounded by vacant lots.

The defendant showed the list of first purchasers, of which the part that referred to this square contained twenty-five names, five being opposite each number, which list was annexed to Holmes's map, and an

x 2

extract from which is given below.   He then showed Holmes's map, the square on which appears thus :   (Plan A.)

A.

| 38 | 39 | 40 | 41 | 42 | 43 |

George Pawnel, being the fourth named, with four others.  } 38

Henry Kellenbeck, with four others.  } 39

Vickeris, Harford, and Brown, with two others.  } 40

&c., &c.

→ River Schuylkill.

He then proved a plan of a square at Front and Vine :   (Plan B.)

B.

SECOND STREET.

VINE STREET.

These appropriated by the allotment to 25 persons.

SASSAFRAS STREET.

SCHUYLKILL FRONT ST.

Certified to be " a true extract taken from the  draft  or  plat  of the city lots, remaining on file" in the land office.

To which plaintiff objected, because it was but part of a paper, not shown of what paper, or when made, and by what authority ;  but the court admitted it.

Plan C was made by the city surveyor, and shows the present localities.   Defendant's enclosure is within the dotted lines :

C.

SASSAFRAS STREET.

396

40.9¾

41.2¾

20

20.4

20

SCHUYLKILL SECOND STREET.

Farr.

Emlen.

Farr.

ALLEY.

26 ft.

ASPEN

SCHUYLKILL FRONT STREET.

He then showed a copy certified by the recorder of deeds, in 1804, of a conveyance, dated in March, 1716, by Reuben and George Pownall, sons of George Pownall, (reciting a lease and release to George, the father, by William Penn, for one thousand acres,) to David Powell, of the city lots belonging to the one thousand acre purchase not yet taken up or located. This was proved in 1716, before a justice of the peace, by the oath of one subscribing witness, (the recorder being present.) It was objected to, " there being no evidence of pedigree, and that the paper was not original," but admitted. Defendant then showed lease and release to Pownall, as first purchaser, for one thousand acres. A conveyance by David Powell, of all his estate, in 1730, in trust, remainder to his daughters, whose sole descendant was Mrs. Dobson, from whom defendants showed descent.

He then offered to show possession in 1804, to prove the boundaries and possession were always the same, for a period as far back as the memory of living witnesses extended, and as tending to show actual possession beyond that period. Plaintiff objected, because no title was shown out of the Commonwealth; that warrant and survey, or some office right, was necessary; that possession could not give title against Commonwealth or her grantee, and the proprietary right, if any, was barred by the act of 10th April, 1781; adverse possession only commencing (to give title) at the date of plaintiff's purchase. But the court admitted the evidence. Defendant then showed he was in possession and erecting a house in 1804; continued to the present time; and the existence of fences back to a swamp, for the filling up of which, in 1830, by the board of health, defendants paid.

Plaintiff then called the city surveyor, who testified that " Holmes's map" did not represent the streets as they now are; that No. 38, on that map, is west of the present Schuylkill Front street. The streets on Holmes's map are about six hundred feet west of those laid down on the present plan. That if he wanted to locate No. 38, on that map, he would go west of the present Schuylkill Front street.

On cross-examination, being shown the Emlen warrant, he said, he had no doubt it was located with one end on the present Schuylkill Front, and the other on Second street. Counsel then asked where he would locate Wm. Brown's warrant? This was objected to, but admitted. He stated he would survey between present Front and Second streets, being governed by the ordinance of 1814, and could only recognise the present plan. He never knew a Front street lot surveyed by him, which had not one end on the present Front street.

Re-examined.—If asked to locate by numbers on Holmes's plan, he would do it by that. But if asked to locate in the range of Kellenbeck,

he would, of course, go alongside Emlen's lot.    The house stands entirely on the northern lot.    The enclosure had been different at different times.    Defendant then showed a warrant to Wm. Brown, in 1683, and survey in 1683 and 1688.

This warrant directed a survey of a front lot, where his lot fell.    The survey was on Front street.

Also the minutes of the Board of Property, on the petition of a first purchaser, in 1714, and a patent for lots on Schuylkill Front street granted thereby.    Reciting a survey on Front street, bounded by lots of Brown and Vickeris.

Also a warrant in 1683, to Bennett, a first purchaser, directing a survey of the lot appointed in the street on front of the purchasers of the like quantity, where his lot is fallen at Schuylkill.    And a copy of the list of first purchasers.

The court was requested by plaintiff to express their views on the following points, in such manner and order as they thought proper.

1.  That under the division as made on Holmes's plan, and the list of first purchasers, each individual was entitled to but one-fifth of each lot, or one-thirtieth of the whole square.

2.  That if it appeared the first purchasers' claims were ascertained by the consecutive numbers, and there had been no severance, the same rule would apply in ascertaining the respective titles of the five who were entitled to one lot on Holmes's plan.

3.  That the claim to a city lot, as marked by the annexation of a name opposite a number, if not more precisely located by warrant and survey, must be held to apply to the spot of ground indicated by Holmes's map.

4.  The location could not be changed after deed of lease and release delivered, but by consent of the proprietary, of which the best evidence was a warrant and survey.

5.  The change in the location of the streets would not change the location of a first purchaser's lot, without his assent, which could not be presumed, nothing having been done for a century after the purchase.

6.  The claim, not having been prosecuted till 1804, was abandoned, and passed to the Commonwealth, under the divesting act.

If the court were against him on these, then,

7.  That a warrant, survey, or some proprietory or office designation of the bounds of a claim were necessary to put the title out of the Commonwealth.

8.  That the building in 1804, and possession since, cannot, in absence of any authority shown, raise presumption of grant against subsequent grantee.

9. The presumption, if any, is not conclusive.

10. No title can be derived in this county by settlement and improvement.

11. Nor by adverse possession against Commonwealth.

12. As against grantee, it commences at the time of his purchase.

13. As to the jury's right to give a verdict for whole or part.

The court charged in substance, 1. If Pownall was a first purchaser, twenty-one years' possession would authorize presumption of a conveyance of the rights of other first purchasers, to an extent necessary to support the title claimed under him.

2. If there was no difficulty as to the rights of other first purchasers named with him, then if the lots in question were part of a city lot, assigned to George Pownall, according to the list of first purchasers, Holmes's map, &c., then possession taken within seven years after the act of 1781, 7th April, sections 8, 9, was sufficient to perfect his inceptive title against the Commonwealth.

3. Whether this lot was assigned to Pownall, was for the jury.

4, 5, and 6. Under the facts proved, the jury might infer a more ancient possession than in 1804, and they must find it as early as 1788, to avoid the statute 1781, and also be satisfied of the pedigree.

7. The act under which the plaintiff claims was confined to vacant lots, the property of the Commonwealth. Possession and improvement of these, without title, legal or inceptive, would not deprive the lot of its character as vacant.

8. The jury might give a verdict for a part. The court was not aware, until reading this point, of any ground for discrimination; but if, upon the law as stated, the evidence would warrant it, the jury should make the proper discrimination.

The counsel said they did not desire more specific answers, and excepted.

The jury found for the defendant.

Errors asssigned:

1. Admission of map C.

2. Admission of deed by Pownall to Powell.

3. Admission of evidence of possession in 1804.

4. Admission of Haines's answer, as to where he would locate Brown's warrant.

In the charge:

1. Answers to the 1st, 8th, 10th, 11th, and 12th points.

2 and 3. In charging as in his 1st, 2d, 3d, and 4th points, there being no proof or evidence to presume possession.

4. In not instructing them in the principles which guide them in his 3d point.

5. In answering in the 7th point, without adding that under the acts of Assembly, of which that of 1821 was one, mere inceptive title, not asserted and prosecuted, should be considered abandoned, so as to make the lot a vacant one.

6. In not stating positively there was ground for discrimination in the 8th point, and leading the jury to believe defendant's whole title rested on same foundation.

*Lewis A. Scott* and *J. M. Scott*, for plaintiff.—1. The map was a muniment of title, and there should have been evidence of what it was. Certainly every loose paper in the land-office is not per se evidence of title. It was but a mere extract; and there is the same presumption against that as against a copy. Dennis *v.* Barber, 6 Serg. & Rawle, 104. The act of 1823 does not help the case, and Griffith *v.* Tunkhouser, 1 Pet. C. C. R. 418, is on the very point. It is moreover essential it should appear to be by the proper officer. Pain *v.* Hartman, 2 Dall. 230.

2. The act of 1715 is the one under which this acknowledgment is made, and in Vickroy *v.* McKnight, 4 Binn. 204, it was held, proof by one witness was insufficient. And if improperly recorded, it is no evidence, or the books are better, 2 Watts, 75; Murphy *v.* Lloyd, 3 Whart. 538; Watson *v.* Craig, 10 Watts, 289; and no possession was shown here to come within Arnold *v.* Gorr, 1 Rawle, 223; 6 Binn. 435; as copies must always come from the proper custody, 8 Adol. & Ellis, 151. It will be observed from 1712 there is not a document mentioning this lot specifically.

3. Possession in 1804 could not affect our right. By a series of acts it will be seen the state has chosen to consider these titles, unless prosecuted before 1788, as derelict, and has assumed the lots, and by very strict enactments forbidden the acquisition of any title but in one way, and under that we are entitled. The acts are 1779, 1 Sm. 479, the divesting act; 1780, Mar. 25, 2 McK. 374; 1781, 1 Sm. 533, which limits claims to seven years, and directs they shall be sold. Nor had defendant a right to enter under this act, but he was bound to proceed against the attorney-general, act 1786, 2 Sm. 380; Mayor *v.* Clifford, 4 Yeates, 272, is an ejectment under this act, and it was for lots 42, 41, in this square; acts of 1791, 3 Dall. 55; 1797, 3 Sm. 300, which is the last extending the time of claim. The cause is not difficult to discover. If parties had not claimed for a century, was it probable

they ever would ? And it was essential for the public credit to dispose of all vacant lands.

Then come the acts for erecting the Penitentiary, under which we claim. 1803, 4 Sm. 87; 1807, Id. 402; 1821, 20th March. Under these, any one in possession, unless as there provided, must take the disadvantage of a plaintiff.

4. There was no such possession here as warranted presumption of a conveyance. The right was of the lowest kind, 2 Sm. 106, 107, 108, 138 ; 5 Sm. 411 ; and most liable to be abandoned, 3 Whart. 538. They passed as chattels, and were so considered, 4 Watts & Serg. 437; Serg. L. Laws, 286 ; 4 Yeates, 142. The question then is, whether there was not presumption of abandonment before 1804. The cases authorize this, for better titles on slighter grounds. Starr *v.* Bradford, 2 Penna., warrant and survey; Plumstead *v.* Raddebaugh, 1 Yeates, 502, there had been possession for thirty years. Hurst *v.* Durnell, 1 W. C. C. R. 263, warrant for liberty land unexecuted for many years. 6 Peters, 498; 4 Peters, 480; 7 Peters, 763; 11 Peters, 41 ; 1 How. 189. But length of time of possession cannot be presumed, 1 W. C. C. R. 80; and it is made here for the purpose of avoiding the act of 81, a statute of repose.

But at all events Pownall, and those claiming under him, could be entitled to no more than he originally had, and that was twenty feet; and there was clear error in leaving it as a question of fact to the jury, whether the whole of the lot now claimed had been assigned to him in his right as first purchaser.

*Oakford,* contrà.—1. An extract from an office paper may be read, De France *v.* Stricker, 4 Watts, 327. So part of an act of Assembly, Addle *v.* Sherwood, 3 Whart. 481. So extracts from land-office accounts, 1 Watts, 57.

2. We were prepared at the trial to show the original was lost, and this was an ancient copy accompanying possession, when it was clearly evidence. 1 Atk. 49 ; Bull. N. P. 254 ; Garurin *v.* Dennis, 4 Binn. 3 ; Duffy *v.* Brindley, 1 Rawle, 94, 95; James *v.* Ethry, 8 Watts & Serg. 192. We had shown possession as far as living witnesses could remember, and that authorizes presumption of an earlier possession, Chad *v.* Filset, 2 Brod. & Bing. 403 ; a usage was presumed under such circumstances. It is said in 10 Pick. forty years is the limit of legal memory. In Rogers *v.* Allen, 1 Camp. 309, 310, ancient licenses were read without proof of payment thereunder, on proof of similar modern licenses and payments under them for forty years. The rule is a reasonable one, as it would otherwise be impossible to establish

the facts, 3 Watts, 165; Serg. L. Laws, 165; Hepburn *v.* Dundas, 5 Cranch, 263.

6. The counsel did not desire a more specific answer. Indeed, the great question was whether the evidence would justify presumption of our older possession, and the possession by us with an older title related to that. Mather *v.* Trinity, 3 Serg. & Rawle, 510, 517; Kingston *v.* Leslie, 10 Serg. & Rawle, 389.

*Cadwalader,* on the same side.—The act of 1781 does not apply. It allowed any person's property to be sold, compensation being directed for the payment of the public debt. The summary proceedings were confined to lots claimed by the proprietors in their individual rights. The plaintiffs themselves showed a clear title, under Kellenbeck, without any paper title or office right. It is sufficient if we show such an appropriation as would be good against the proprietaries, and this we have done by Holmes's ancient map, and the more modern one, agreeing that this square had been appropriated. A number on Holmes's map has been held sufficient in Mayor *v.* Clifford, 4 Yeates, 272; Commonwealth *v.* Alberger, 1 Whart. 469. Our case is exactly similar, except that a corporation claimed as trustee for the public. It has been supposed that Holmes's map was altered, after it was laid out on the ground. But, in fact, the present plan existed in 1683, and the Centre Squares were in the same position as at present. The map known as Holmes's was made in London, by one who evidently had not seen the ground. But the plan now used was made prior to Penn's arrival here. Letter to Turner, 12th April, 1681, Historical Soc. Coll. 1 vol. 202, 204.

The charter was in the previous month, eighteen months prior to the grant of the three lower counties. The surrender was received in New York, in June, 1 Hazz. Reg. 305; and in August the records at Upland show he was acting as governor. In July, the conditions and concessions were made which presuppose a settlement, and the instructions to the commissioners, 30th September, 1681, forbade grants until location, 2 Hist. Soc. Coll. 216, 217; this was thirteen months before Penn's arrival. In March, 1682, eight months before his arrival, Markham issued grants, which were forbidden unless the plot was then made. *Mr. Cadwalader* read from a book of warrants in the Recorder's office, warrants and surveys under Markham, p. 54, a lot on Walnut street, 1682. The allotment on Holmes's plan was not about the time of his letter to the Society of Free Traders, but in 1682, for that map and list of purchasers contain only the Front and High street lots, but this book contains a drawing of the inner lots on p. 1,

made after Holmes's plan, dated 19th September, 1682, and the exemplification of the list from Harrisburg agrees with the numbering. This explains the remark in Proud, 262, 263, as to the advance of the city, 1 Hist. Soc. Coll. 413 ; 1 Watson's Annals, 49. The only change was between the paper plan and that located. *Mr. Cadwalader* read a survey for a lot on Eighth from Schuylkill and Broad street, laid down on the map, adjoining the Centre Square, dated 1684.

The evidence here shows that any one entitled to a front lot, according to Holmes's plan, took one on the Front street as laid down. The grouping was according to the *concessions.* Thus the two maps, one of the proposed, the other the actual plan, agree as to this square. This is sufficient to exclude subsequent office rights without possession. We have shown four out of the twenty-five actually were located in the present square. A survey was only necessary to ascertain the spot, but it gave no right. There is no dereliction where possession is taken before another title commences. 10 Serg. & Rawle, 389, 390 ; 7 Watts & Serg. 215, 217.

In the act of 1759, under which the Book of Warrants was compiled, the preamble recites many warrants and surveys were lost; act 1786, March 28. In 4 Yeates, 144, Shippen, C. J., said, the survey of the Liberty lands was lost. Many lots are held under the allotments merely. Twenty-one years' possession does not bar the remedy, but gives a right, 2 Salk. 421 ; Burr. 119 ; 2 J. & Walk. 156 ; 5 Serg. & Rawle, 240 ; 4 Whart. 275, 290.

Under the second error, two objections have been made ; the one stated below is the only one noticeable here. In 8 Watts & Serg. 192, recitals in a deed accompanying possession were held evidence of pedigree. So in 5 T. R. 413, Clarkson *v.* Woodhouse, where the deeds were so ancient that no one could speak to possession under them, provided the modern possession had been consistent. The objection to the acknowledgment was not made below, but even then it is admissible as an ancient copy. Styles, 445 ; 4 Dow. 297, 334. It was ruled in Smyth *v.* Craig, at this term, that the party is strictly confined to the form of his exception.

A survey and warrant was not necessary for any appropriated lands ; even in the case of the proprietaries it was a mere formality required to save the divesting act. The act giving compensation shows this, but the plaintiffs must go further, and show no presumption exists of a warrant and survey. The fact of this book of warrants being accidentally saved from destruction, would compel such presumption, but the authorities are sufficient ; 12 Rep. 4 b, Beadle *v.* Beard is a case of presumption of endowment from length of possession ; Powell *v.*

Y

Milbank, Coop. 103, of a grant by the crown from two presentations; 11 East, 490, of crown lands from possession of fifty-five years; Jackson v. McCall, 11 Johns. 377, of patent. Serg. Land Laws, 206; Wilson v. Stoner, 9 Serg. & Rawle, 38. This is said not to apply, probably, to parts of the state recently settled, Mather v. Trinity, 3 Serg. & Rawle, 570; Murphy v. Lloyd, 3 Whart. 538, 545, 546.

4th. The witness was an expert, and, as such, competent to testify, 9 Bing. 335, 336; 4 Pick. 158, 159, Davis v. Mason; but here the witness had been examined in chief to the same point. The divesting act contains many classes of provisions; 11th, 12th, 13th, 14th sects. refer to the private claims of the proprietaries. The 8th, 9th, 10th, with 4th, had reference to intruders merely. I construe the words "or otherwise," to refer to a proceeding by a claimant out of possession against a purchaser from the Commonwealth. In Shoemaker v. Huffnagle the right was held derelict, because there had been no possession for a century and a half.

*March* 10. SERGEANT, J.—In the general principles of law contained in the charge of the court, we perceive no error, but in their application to the present case, we think a distinction must be made as to the quantity of ground claimed, to which the defendant sets up a title interfering with the plaintiff's purchases, which would seem to be two lots of about twenty feet each. So far as the defendant was entitled as holding under one of the first purchasers of a city lot appurtenant to his one thousand acres, we do not perceive that it was indispensably necessary that he should have procured a warrant and survey from William Penn, or his successors, although this course seems to have been taken in many instances, and was, perhaps, the most prudent, so as to set out and appropriate the same in severalty. But we do not, at this time of day, feel at liberty to decide, that if a first purchaser of a city lot, designated on the map or plot, took possession where his lot fell, it would not give title. Such purchaser had a strong equity by payment of his money, and a deed from the proprietaries in general terms; and we see no reason why he might not appropriate it in severalty by taking possession and holding it undisturbed. This appears to have been the only title by which the defendant obtained a verdict in the case of the Mayor v. Clifford, 4 Yeates, 272, 379, for one city lot, and no question was made on this head by court or counsel. There the plaintiff claimed a large lot on Schuylkill Front street near Vine, by patent from the Supreme Executive Council in 1790. The defendant showed possession of three lots, parts of the lots claimed, from the year 1787, under a mere survey of the city regulator, with a

title under Francis Smith, a first purchaser, to one of the three lots of which he had possession. A verdict was given for the defendant as to the lot to which he showed title under Francis Smith, and for the plaintiff as to the residue, and was confirmed, after argument, on a point reserved. This case seems entitled to weight with us, considering its much nearer approximation to the origin of these titles than we possess at present.

The subject is now, after a lapse of a century and a half, necessarily obscure, especially when we find Judge Smith, more than thirty years ago, complaining of its intricacy. 2 Smith's Laws, 138. As, however, a purchaser of one thousand acres was entitled only to one lot on Schuylkill Front street, of twenty or twenty-one feet, 2 Smith's Laws, 107, he would be authorized to take possession and hold under his original title only so much. If he took possession of more, it was wrongful. Here the possession is shown as far back as the year 1804, forty years ago; and we think that if George Pownall was the person under whom the ancestor of the defendant's landlord held, and was one of the five first purchasers to whom a city lot was appropriated, this possession continuing to the present day, being consistent with the title, would authorize the jury to presume an ancient possession long enough to support the title to the extent of the right, but not for any further portion of ground. Beyond that, the case would require another presumption, namely, of a conveyance from some other first purchaser, which cannot be made from a mere possession encroaching on the proprietary or Commonwealth, or those holding from them as grantees under the acts of Assembly. The act of 1781, and subsequent acts on the subject, are directly levelled against intruders, who without right had taken or should take possession of city lots, and make such possession illegal, so that no right could be acquired under it: but, on the other hand, was not designed to disturb those who had that possession under the title of the first purchasers; for all these acts for divesting and disposing of the proprietary rights, saved the titles of previous bonâ fide purchasers from them, in whatever mode manifested, and if their lots happened to be sold under the act of 1781, it provided compensation. So the act 20th March, 1821, under which the plaintiff's title accrued, authorized the sale only of the title and interest of the Commonwealth in vacant lots undisposed of. The general limitation clauses of the act of 1781 seem not to apply to first purchasers or their grantees, then in possession, or who took possession within seven years, where there was no proceeding to sell their right or disturb their possession.

The other points arising in the bills of exceptions are not sustainable. The first is to the extract from the draft or plot of the city lots

remaining on file in the office of the secretary of the land-office, which is objected to as being a mere extract, and also because its authenticity was not previously shown. An extract is evidence, if it appears on its face to contain all that relates to the subject in controversy. It cannot be deemed necessary for a party to go to the expense of copying large plots and maps containing irrelevant matter. In De France *v.* Stricker, 4 Watts, 327, a certified extract from the general draft of donation land, for which a patent had issued, was held to be receivable in evidence. The same principle was applied to an act of Assembly in Addle *v.* Sherwood, 3 Whart. 481. As to the other ground, the act of 21st of March, 1823, makes copies of records, documents, and papers in the offices of the land-office, evidence where the original would be. If they are there on file, the presumption is they are regularly so, unless objectionable on their face. To require previous proof that they were authentic, would be attended with great inconvenience, and defeat the object of the act. In Oliphant *v.* Ferren, 1 Watts, 57, extracts from blotters in the office were held evidence under this act, though deemed not properly office books.

The second bill of exceptions was taken on the ground that there was no evidence of pedigree, and that the paper offered was not the original. The ground now taken is, that the deed was not proved by the two subscribing witnesses. This is an entirely different one, and would subject the other party to be taken by surprise. We think the plaintiff in error is confined to the grounds taken below, and cannot now travel out of them.

Judgment reversed, and venire facias de novo awarded.